**SEALED**

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS 2007 OCT 29 PM 1:56
### SAN ANTONIO DIVISION

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | § | |
| [UNDER SEAL], | § | |
| | § | **CIVIL ACTION NO.** |
| | § | |
| Plaintiffs | § | |
| | § | **SA07CA0880** RF |
| vs. | § | |
| | § | UNDER SEAL |
| [UNDER SEAL], | § | |
| | § | **JURY TRIAL DEMANDED** |
| Defendants | § | |
| | § | |

## PLAINTIFFS' *QUI TAM* COMPLAINT
### PURSUANT TO THE FEDERAL FALSE CLAIMS ACT

LAW OFFICE OF GLENN GROSSENBACHER
Glenn Grossenbacher
TX Bar No. 08541100
1800 McCullough
San Antonio, Texas 78212
Tel: (210) 271-3888
Fax: (210) 271-3980

Goode Casseb Jones
Riklin Choate & Watson
A PROFESSIONAL CORPORATION
John E. Clark
TX Bar No. 04287000
Rand J. Riklin
TX Bar No. 16924275
2122 North Main Ave.
San Antonio, Texas 78212
Tel: (210) 733-6030
Fax: (210) 733-0330

LAW OFFICE OF GARY M. GROSSENBACHER
Gary M. Grossenbacher
TX Bar No. 24008972
8114 Talbot Ln.
Austin, Texas 78746
Tel: (512) 699-5436
Fax: (512) 514-0001

Alvarado & Alvarado, P.L.L.C.
Leo Alvarado, Jr.
TX Bar No. 01126500
Rosemarie Alvarado-Hawkins
TX Bar No. 24036131
115 Camaron, Suite 100
San Antonio, Texas 78205
Tel: (210) 223-2685
Fax: (210) 223-9464

ATTORNEYS FOR PLAINTIFF

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*,CLINTON E. CRADDOCK, FRED VAN SHOUBROUEK, ANTHONY RICO AND FERNANDO DE LA GARZA, | § § § § § | CIVIL ACTION NO. |
| **Plaintiffs** | § § | |
| | § | UNDERLINE SEAL |
| **vs.** | § § | |
| THE BOEING COMPANY AND ITS SUBSIDIARIES, INCLUDING ITS BOEING INTEGRATED DEFENSE SYSTEMS AND BOEING AEROSPACE SUPPORT SYSTEMS SEGMENTS | § § § § § | JURY TRIAL DEMANDED |
| **Defendants** | § | |

## PLAINTIFFS' *QUI TAM* COMPLAINT
## PURSUANT TO THE FEDERAL FALSE CLAIMS ACT

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................ 1

II.    FILING UNDER SEAL ................................................... 1

III.   JURISDICTION AND VENUE ............................................. 1

IV.    THE PARTIES ......................................................... 2

       A. PLAINTIFFS/RELATORS .............................................. 2

       B. DEFENDANTS ....................................................... 3

V.  BACKGROUND INFORMATION GENERALLY APPLICABLE TO CLAIMS ..................... 5

    A. BSS-SA AND UNITED STATES AIR FORCE PROGRAMS SUPPORTED AT BSS-SA ........ 5

    B. GENERAL CATEGORIES OF AIRCRAFT WORK .................................. 5

    C. PROGRAM WORK CONTRACT STRUCTURE, AUTHORIZATION AND FUNDING, AND
       GENERAL ACCOUNTING OF COSTS AND CHARGES ............................. 6

    D. OVER-AND-ABOVE, RED X WORK ........................................... 8

    E. BAR CODE PROCEDURES .................................................. 9

    F. OFF-AIRCRAFT ACTIVITIES .............................................. 11

    G. TYPES OF CONTRACTS ................................................... 12

    H. AIR FORCE PROGRAM CONTRACT TYPES RELATING TO THE WORK PERFORMED
       AT BSS-SA ............................................................ 14

VI.    THE DEFENDANTS' FRAUDULENT CONDUCT .................................. 15

    A. CHARGING LABOR TO RED X OVER-AND-ABOVE TASK(S), WHEN ACTUAL WORK
       PERFORMED ON UNRELATED, PLANNED TASK(S) ............................. 15

    B. CHARGING LABOR TO AIRCRAFT TASKS, WHEN ACTUAL TIME SPENT ON
       OFF-AIRCRAFT ACTIVITIES ............................................. 18

    C. CHARGING LABOR TO CANNIBALIZE PARTS FROM ONE AIRCRAFT FOR ANOTHER
       AIRCRAFT, WHEN THE PARTS SHOULD HAVE BEEN AVAILABLE FROM THE SPECIAL
       INVENTORY OF LIMITED PARTS MAINTAINED BY BOEING AND PRE-PAID BY THE
       GOVERNMENT (MICAP CANNS) ............................................ 21

i

D. CHARGING LABOR TO UNRELATED TASK(S), INSTEAD OF TO THE DISCRETE BAR CODE CREATED TO ACCOUNT FOR CHARGES TO CANNIBALIZE PARTS FROM ONE AIRCRAFT FOR ANOTHER AIRCRAFT, IN SITUATIONS WHERE THE PARTS ARE NOT PARTS MAINTAINED BY BOEING IN THE SPECIAL INVENTORY OF LIMITED PARTS PRE-PAID BY THE GOVERNMENT (AF CANNS) .............................. 23

E. CHARGING LABOR TO UNRELATED TASK(S), INSTEAD OF TO THE DISCRETE BAR CODE ASSIGNED TO ACCOUNT FOR CHARGES ASSOCIATED WITH THE REPAIR, REPLACEMENT, AND OTHER COSTS OF LOST, DAMAGED, AND DESTROYED GOVERNMENT PROPERTY (LDDs) ........................................ 23

F. CHARGING LABOR TO DUPLICATE OVER-AND-ABOVE TASKS RELATING TO THE SAME WORK ........................................................ 25

G. CHARGING LABOR TO CANCELLED TASKS, WHEN ACTUAL WORK PERFORMED ON UNRELATED AIRCRAFT/TASK ......................................... 25

H. MULTIPLE CHARGES FOR THE SAME PART NEEDED AND USED TO COMPLETE AND CLOSE OUT AN OVER-AND-ABOVE TASK, WHEN ONLY ONE PART NEEDED AND PART WAS REQUISITIONED FROM MULTIPLE, DIFFERENT SOURCES FOR THE SOLE PURPOSE OF EXPEDITING RECEIPT OF THE PART ....................... 26

I OBTAINING APPROVAL AND FUNDING OF OVER-AND-ABOVE TASK TO REPAIR OR REPLACE DEFECTIVE PARTS OR OBTAIN MISSING PARTS, AND IN SOME INSTANCES TO INSTALL REPAIRED OR REPLACEMENT PARTS, WHEN KITS RECEIVED FROM SUPPLIERS FOR PLANNED WORK CONTAINED DEFECTIVE PARTS OR WERE INCOMPLETE ............. 27

J. OTHER INFORMATION AND REPRESENTATIVE EXAMPLES OF COST-CHARGING IRREGULARITIES ..................................................... 27

VII. THE UNITED STATES HAS BEEN DAMAGED ................................... 30

VIII. PLAINTIFFS' DIRECT AND INDEPENDENT KNOWLEDGE OF THE DEFENDANTS' FRAUDULENT CONDUCT AND VOLUNTARY DISCLOSURE OF THE INFORMATION TO THE GOVERNMENT BEFORE FILING THIS ACTION ............................ 30

IX. COUNT ONE–FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1) ............... 31

X. COUNT TWO–FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729 (a)(2) .............. 31

XI. JURY DEMAND ....................................................... 32

XII. CONCLUSION ....................................................... 32

# I.

## Introduction

1. Plaintiffs bring this *qui tam* action against the defendants for themselves and for the United States, pursuant to the **Federal False Claims Act (FCA)**, 31 U.S.C. §§ 3729-3733, and the authority granted under §3730 of the FCA. In this action Plaintiffs seek to recover damages and civil penalties from defendants for violations of §3729, based on the false claims presented by defendants to the United States for work performed at **Boeing Support Systems - San Antonio (BSS-SA)** under government contracts to maintain, repair and modify certain United States Air Force aircraft.

# II.

## Filing under seal

2. In accordance with 31 U.S.C. § 3730(b)(2), this complaint is filed <u>in camera</u> and will remain under seal and will not be served on the defendants until the Court so orders. A copy of the complaint and written disclosure of substantially all material evidence and information the Plaintiffs possess have been served on the United States pursuant to 31 U.S.C. § 3730(b)(2) and Federal Rule of Civil Procedure 4(i).

# III.

## Jurisdiction and venue

3. This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732. The action arises out of violations of 31 U.S.C. § 3729 by the defendants, and certain of the acts proscribed by 31 U.S.C. § 3729 on which this action is based occurred in this judicial district. In addition, the defendants transact business in this judicial district, within the meaning of 31 U.S.C. § 3732(a).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1395.

## IV.

### The parties

**A. Plaintiffs/Relators**

5. Plaintiff, **Clinton E.Craddock (Craddock)**, is an individual residing in San Antonio, Bexar County, Texas. Craddock is currently employed by The Boeing Company at BSS-SA. For the past 8 years, from approximately 1998 to the present, he has been an over-and-above work estimator at BSS-SA supporting the C-17 military aircraft program. Over-and-above work, as more fully discussed below, is unplanned maintenance and repair work discovered during the performance of scheduled service work. He has a total of 28 years of experience in the aircraft industry, not including a 1 year layoff from 1992-1993. He began his career with McDonnell Douglas Corporation in August, 1978. He worked 15 years as a mechanic, 6 years as a first line aircraft manager supervising mechanics working on aircraft and aircraft sub-components (e.g., aircraft wing, landing gear, et al.), and the last 9 years as a level 4 estimator, 8 of those years at BSS-SA after The Boeing Company acquired McDonnell Douglas Corporation in August, 1997.

6. Plaintiff, **Fred Van Shoubrouek (Van Shoubrouek)**, is an individual residing in Helotes, Bexar County, Texas. Van Shoubrouek is currently employed by The Boeing Company at BSS-SA. For the past 9 years, from approximately November, 1998 to the present, he has been a Specialist Contract Administrator at BSS-SA supporting the C-17 military aircraft program. He has a total of approximately 20 years of contract and contract administration experience in the aircraft industry. He began his career with McDonnell Douglas Corporation in April, 1987. He worked on the Delta II missile program from April, 1987 to February, 1991 as a staff analyst and from February, 1991 to June, 1992 as a senior staff analyst. He next worked as a senior contract administrator on the Space Station program from March, 1992 to March, 1997 and then on the Boeing Integrated Defense

2

Systems segment from March, 1997 to October, 1998, before being promoted to his current position as a specialist contract administrator for the C-17 program in 1998.

7. Plaintiffs, **Anthony Rico (Rico)**, is an individual residing in San Antonio, Bexar County, Texas. Relator Rico is an aircraft mechanic and has held an FAA Air Frame and Power Plant license since 1987. He worked on Air Force KC-10 aircraft at BSS-SA as an employee of subcontractor Aerotek from January, 2002 to May, 2004 and of subcontractor Piping and Design Systems from January, 2005 to May, 2005 and from March, 2006 to October, 2006.

8. Plaintiff, **Fernando De La Garza (De La Garza)**, is an individuals residing in San Antonio, Bexar County, Texas. Relator De La Garza was employed by The Boeing Company at BSS-SA from 2001 to July, 2007. De La Garza worked on the Air Force KC-10 aircraft as an avionics technician from 2001 to 2004 and as an aircraft mechanic from 2004 to April, 2005. He was transferred to and worked as an avionics technician in the C-130 program from April, 2005 to May, 2007 and in the C-17 program from May to July, 2007, at which time he took a job with another company.

9. Craddock, Van Shoubrouek, Rico and De La Garza are **collectively referred to as "Plaintiffs" or "Relators"** in this complaint.

**B. Defendants**

10. Defendant, The Boeing Company, is a Delaware corporation headquartered in Chicago, Illinois and authorized to do business in Texas. Its registered agent for service of process in Texas is Corporation Service Company, which can be served at its registered office, 701 Brazos Street, Suite 1050, Austin Texas 78701.

11. **The Boeing Company, together with its subsidiaries, collectively referred to as "Boeing"** in this complaint, is one of the world's major aerospace firms. Boeing is the world's largest

combined manufacturer of commercial jetliners and military aircraft and the world's second-largest defense company.  Boeing employs approximately 153,800 employees in 48 U.S. states and 67 countries.

12.  Boeing is a party to numerous contracts with the U.S. Government, including all of the branches of the U.S. military, NASA, and Homeland Security.  In 2005, 51% of Boeing revenues were derived from U.S. Government contracts.

13.  Boeing and its subsidiaries are organized based on the products and services they offer and operate in the following six principal segments:

- Commercial Airplanes;
- Four segments that comprise the defendants' **Integrated Defense Systems (IDS)** business:
    - Aircraft and Weapon Systems,
    - Network Systems,
    - Support Systems, and
    - Launch and Orbital Systems; and
- Boeing Capital Corporation.

14.  Boeing's IDS business is principally involved in the research, development, production, modification and support of aerospace and defense products and related systems and services, including military aircraft, i.e., fighters, transports, tankers, and helicopters. IDS's primary customer is the **United States Department of Defense (US DoD)**.  Over 90% of IDS 2005 revenues were received from the US DoD.

15. The Support Systems segment of the defendants' IDS business is engaged in the operations, maintenance, training, upgrades, and logistics support functions for military platforms and operations. Included in this segment are program areas for the maintenance, modification, and upgrade of

military aircraft.

## V.

### Background information generally applicable to claims

**A. BSS-SA and United States Air Force programs supported at BSS-SA**

16.  BSS-SA is located at KellyUSA (including Buildings 375 and 400), which is the former Kelly Air Force Base in San Antonio, Bexar County, Texas.  BSS-SA was established in 1998 to provide a maintenance, modification and upgrade center for large aircraft and was formerly known as Boeing Logistics Support Systems, and before that, as the Boeing Aerospace Support Center. BSS-SA utilizes over 1.4 million square feet of enclosed area, including 668,000 square feet of hangar space, plus 3.5 million square feet of aircraft ramps, runup areas and parking pads.  BSS-SA includes Building 375, the largest free-standing, high-bay aircraft hangar in the world, which can accommodate up to 15 wide-body aircraft at a time.

17. At BSS-SA, Boeing performs a major portion of the work under five United States Air Force programs, including the **C-17 Globemaster III Sustainment Partnerships (GSP), KC-10 Contractor Logistics Support (CLS), KC-135 Program Depot Maintenance (PDM), KC-135 Global Air Traffic Management (GATM), and C-130 Avionics Modernization Program (AMP).**

**B. General categories of aircraft work**

18.  There are four statuses of work performed on aircraft under the Air Force programs at BSS-SA: Depot, Speedline, Drop-in, and **Unscheduled Depot Level Maintenance (UDLM)** service.

19.  Depot work is routine maintenance which is periodically scheduled based on the use of the aircraft.  With regard to the C-17 program, depot work is currently scheduled every 2 ½ years for each plane and comprises the vast majority of work performed on aircraft.

20.  Speedline work is non-routine service work scheduled for a fleet, to address a serious

problem detected in one plane which could adversely affect performance and may potentially be of general concern for the fleet.

21. Modifications and upgrades, as opposed to routine maintenance, are usually scheduled during Depot work, but sometimes may be scheduled during Speedline work.

22. Drop-in work and UDLM are both types of non-routine service items scheduled to address a particular problem arising in connection with a particular plane which requires immediate attention.

**C.  Program work contract structure, authorization and funding, and general accounting of costs and charges**

23. The work to be accomplished under program contracts is divided, in part, into **Contract Line Item Numbers (CLINs)** which are further subdivided into **subCLINs**. A CLIN generally describes the scope and states a dollar amount for a segment of the work to be accomplished under a particular contract, and the subCLINs describe the scope and state a dollar amount for subdivisions of the work to be accomplished under a CLIN.[1]

24. Before work on aircraft proceeds under a CLIN/subCLIN, the government contracting officer administrating the contract sends Boeing a Letter of Authority. The Letter of Authority authorizes an estimated amount of funding against specific CLINs/sub-CLINs and defines the scope of work. Once Letters of Authority have been issued, individual planes may be scheduled for service against the corresponding CLINS/subCLINs.

25. In anticipation of the arrival of a particular aircraft for Depot service, the Air Force issues an **Air Force Technical Order 103 (AFTO 103)** form which itemizes the approved, planned work to be performed on that particular plane. Planned work designations include **Time Compliant Technical**

---

[1] CLINs and subCLINs are used to address multiple issues besides scope of work. For example, with respect to an unpriced option for specified work, where the price and award fee amounts will be negotiated and established at a later date (i.e., the item is only a placeholder), Information Funding subCLINs can be used to identify and obligate funds for the item and the earned award fee can be provided under a separate CLIN to be established.

Orders (TCTOs) and **Work Instruction Record/Fleet (WIR/FLT)**. Each TCTO and WIR/FLT describes a specific task to be accomplished (e.g., Inspection of main landing gear post swivel bolts). A typical AFTO 103 lists several dozen tasks (e.g., TCTOs and WIR/FLTs) to be accomplished. As explained in the next paragraph, most of the work is pre-funded and can begin as soon as the plane arrives.

26.  The Air Force issues **Amendment of Solicitation / Modification of Contract (AMODs)** to establish funding authorization and guidance for particular tasks.[2] Work cannot proceed until funding is authorized. An AMOD usually pre-authorizes funding for the same task(s) on multiple aircraft, and it is for this reason that most of the work described in an AFTO 103 is pre-funded. Every AMOD references the corresponding Letter of Authority under which it is issued.

27.  Boeing assigns a single labor and/or a single material **Cost Charge Number (CCN)** to any *funded, planned task* in the majority of cases and to a *funded group of planned tasks* in fewer instances, to capture costs and charges related to the task or grouped tasks performed on multiple, individual aircraft. Certain planned tasks included in the AFTO 103 may be *unfunded*. For these planned, but unfunded, tasks, Boeing establishes a single CCN to keep an account of costs and charges once funding authorization is received.

28.  Boeing generally also creates and assigns a unique **bar code** for each specific task to capture labor costs and charges related to that task. In rare instances (less than 5% of the time), 2 bar codes are assigned to a given task in order to separately track mechanical and avionic work. In still fewer instances, two or more bar codes are assigned for other reasons. A bar code may relate to planned work; over-and-above work (discussed below);  general and administrative and other overhead labor

---

[2] AMODs may establish funding authorization for items other than labor, such as airplane part kits and work-related travel.  CCNs may also operate in this fashion.

costs and charges; and other matters, including non-chargeable time (e.g., human resource and medical visits).

29.  Boeing manages at the task level and reports to the government at the subCLIN level.  That is to say, although Boeing internally manages the costs and charges imputed to the performance of work on each task, the costs and charges of all tasks are rolled up and reported to the government in the aggregate at subCLIN level.  The costs and charges imputed by Boeing for any individual task or CCN are not reported.

## D.  Over-and-above, RED X work

30.   The terms "Over-and-Above," generally,[3] and "RED X," always, refer to unplanned work discovered during the course of performing planned work on aircraft.

31.  Based on experience, the government anticipates that RED X work will comprise 25% of the total labor hours expended during the performance of Depot work on any particular plane and plans its funding of Depot work with this consideration in mind.

32.  For each plane, for each year of a contract, the government issues a funding letter to cover anticipated RED X work in an amount based on average historical costs and charges, and Boeing establishes a single, corresponding CCN to keep an account of all RED X costs and charges for that single plane for that year.

33. Boeing prepares and submits to the government for approval a separate estimate for each RED X item discovered during the course of the performance of work.  RED X work is routinely approved and funded.  Relators are unaware of any estimate ever being denied to date.

---

[3] "Over-and-Above" may also refer to a section of the program contract or a CLIN.  For instance, Annex F of the C-17 program contract and CLIN 9 under that annex both contain the phrase  "Over-and-Above" in their titles, even though certain planned, as well as discovered, unplanned tasks are covered/listed under each of those contract subparts.

34.  HJ Ford is a private, commercial firm retained by the government to assist in the administration of certain aspects of the Air Force program contracts, including the review and approval of proposed RED X work.  HJ Ford is sometimes referred to as the **Contracting Officer Technical Representative (COTR)** or by the acronyms SG or SPO.

35.  Once a RED X estimate receives funding approval, Boeing assigns a bar code for that RED X task.  All individual RED X tasks for a particular plane are rolled up into one common CCN, and the RED X CCNs for all planes are rolled up to one common over-and-above subCLIN.

36.  For each plane, RED X costs and charges initially are applied against the pre-funded amount allocated for that plane.

**E.  Bar code procedures**

37.  Historically, Boeing mechanics and support personnel and Boeing subcontractor employees have been provided with bar codes corresponding to the planned and unplanned tasks they may be assigned to perform.  Contemporaneously with a worker's commencement of an activity relating to the accomplishment of a particular task, the person is required to scan his badge and the corresponding bar code for that task into the computer-based accounting system in order for the system to accurately account for the time the person spends on the task, and accordingly, the associated costs and charges. At the beginning of a work shift, a worker uses a wand to scan the bar code on his identification badge to clock into the system.  During his shift, as he moves from one task to another, at the start of each task the worker is supposed to scan to his badge and the appropriate corresponding bar code for the task.  When the worker scans to a new task, the system automatically clocks him off of the prior task. At the end of the shift, the employee scans his identification badge bar code to clock off of the system. However, the system will automatically clock out a worker who fails to clock out at the end of the shift.  First line managers could override the system and change a mechanic's schedule to allow for overtime work.

38. AutoTime is the labor accounting software used at BSS-SA for labor collection.

39. With regard to planned work, from August, 1998 until the early part of 2006, workers were distributed printed sheets of multiple bar codes covering all work itemized under the AFTO 103 issued for a particular plane arriving for service. Beginning in early 2006, Boeing had workers use a mix of printed bar code sheets and an electronic log-in procedure to clock on to a task. To clock on to a task using the electronic log-in procedure, a worker selected a particular task from a computer screen menu. Since August, 2007, with very limited exceptions, one or more binders containing each of the specific TCTO, WIR/FLT, and other work packages/tasks are maintained at a designated work station of the aircraft. A bar code label is printed and attached to each work package, and Boeing workers are supposed to pull the work package for the task they are about to begin, scan the bar code, and return the work package to the book. The electronic log-in system is currently used only for the Large Aircraft Infrared Counter Measures upgrade. As previously stated, when a worker scans to a new task the system automatically clocks him off of the prior task on which he was working.

40. With regard to unplanned work, from August, 1998 until sometime in the early part of 2005, workers were distributed printed sheets of multiple bar codes covering Over-and-Above work. In early 2005, Boeing began the conversion from the workers' use of distributed bar code sheets to a procedure that permitted workers to print bar codes, as needed, from the electronic records keeping system. During the conversion process, workers used the distributed bar code sheets to clock on to tasks in some instances and the bar codes printed from the electronic system in others. Conversion to the electronic system was completed in approximately August, 2006, and is still in use.

41. Boeing requires workers to be scanned to a task the entire time they are on the BSS-SA premises, with rare, if any, exception. There are two 9 ½ hour shifts, including 30 minutes for lunch. Shift 1 is from 5:30 a.m. to 3:00 p.m., with the lunch break scheduled from 11:15 to 11:45 p.m., and Shift 2 is from 3:00 p.m. to 12:30 a.m., with a lunch break scheduled from 8:00 to 8:30 p.m. The

system automatically clocks off each person during the scheduled lunch period.

**F. Off-aircraft activities**

42.  Off-aircraft activities include **Employee Involvement (EI)** meetings, medical visits, human resource visits, all hands meetings, boss talks, **Foreign Object Debris/Damage (FOD)** walk downs, company directed cleaning, tool box shadowing, floor audits, training, company ceremonies, recognition/awards lunches, and other similar activities (e.g., injuries, blood drives, hearing tests, fire drills, plant closures) which are unrelated to the actual performance of labor on aircraft tasks.

43.  Since approximately 2004, all crews (e.g., avionics, structure, systems, etc.) within each program attend weekly, 1-hour EI meetings.  The ostensible purpose of EI meetings is to develop self-directed work teams that can work self-sufficiently with minimum intervention by management.  There is a full-time Boeing EI facilitator for all programs, and there are 4 levels of EI meetings.  Generally, at level 1 the facilitator conducts the meetings to address work related issues, at level 2 the crews run the meetings with the facilitator's guidance, at level 3 the crews conduct the meetings with little or no participation by the facilitator, and by level 4 the crew conducts the meetings with little or no participation by the facilitator and executes its plans at the work stations in performing tasks.  In practice, many of the meetings are little more than general bellyache and bull sessions, particularly at the 1 and 2 EI levels.

44.  A FOD walk down refers to the policing of debris at a program site to protect against potential damage to aircraft from foreign objects.  For each program, at least once a week, one or more crews conducts a FOD walk down according to a schedule.

45.  Off-aircraft activities are charged to overhead accounts and with few, if any, exceptions are either non-compensable items or items compensable at rates substantially lower than the rates chargeable for work performed on aircraft.

46.  Until August or September, 2007, off-aircraft activity labor costs and charges were captured

11

at the site level. That is, there was one, site-wide bar code for each type of off-aircraft activity for all programs at BSS-SA. In some instances, an individual activity had its own CCN, and in other instances several individual activities rolled up into a single CCN.

47. Beginning in August or September, 2007, off-aircraft activity labor costs and charges have been captured at the program level. There is one, program-wide bar code for each type of off-aircraft activity for each program at BSS-SA. In some instances, an individual activity may have its own CCN, and in other instances several individual activities may roll up into a single CNN.

48. In connection with off-aircraft activities, Boeing has a "29 minute" rule which applies to unplanned, as opposed to planned, activities. By way of illustration, pursuant to this rule, if an employees spends less than 29 minutes in an unplanned boss talk, the employee remains clocked to the job on which he was working immediately prior to the unplanned activity. With regard to any time spent beyond 29 minutes, the employee must scan the boss talk bar code. If a boss talk is planned the employee must scan the boss talk code for the entire time period, not just the time beyond 29 minutes.


**G. Types of Contracts**

49. Contract types vary according to the responsibility assumed by the contractor for the costs of performance and the profit incentive offered for achieving or exceeding specified standards or goals.

50. Contract types are grouped into two broad categories: fixed-price contracts and cost-reimbursement contracts. The specific contract types range from firm-fixed price, in which the contractor has full responsibility for the performance costs and resulting profit or loss, to cost-plus-fixed-fee, in which the contractor has minimal responsibility for the performance costs and the negotiated fee (profit) is fixed. In between are various incentive contracts, in which the contractor's responsibility for the performance costs and the profit and fee incentives offered are tailored to the uncertainties involved in contract performance. The cost-plus-a-percentage-of-cost system of

contracting is prohibited.  Selecting the contract type is generally a matter of negotiation.

51.  Incentive contracts are appropriate when a firm-fixed-price contract is not appropriate and the required supplies or services can be acquired at lower costs and, in certain instances, with improved delivery or technical performance by relating the amount of profit or fee to the contractor's performance.  Generally, incentive contracts establish cost, delivery, and/or technical performance targets and include incentives designed to motivate contractor efforts and discourage contractor inefficiency and waste; increases in profit or fee are provided for achievement that surpasses the targets, and decreases are provided to the extent that targets are not met.  Generally, no incentive contract may provide for other incentives without also providing a cost incentive or constraint, and most incentive contracts include only cost incentives.  The two basic categories of incentive contracts are fixed-price incentive contracts and cost-reimbursement incentive contracts.  Award-fee contracts are another type of incentive contract and generally are used when contractor performance cannot be measured objectively.  Since it is usually to the Government's advantage for the contractor to assume substantial cost responsibility and an appropriate share of the cost risk, fixed-price incentive contracts are preferred.  Standard types of incentive contracts include contracts where the profit adjustment is made in accordance with a preestablished formula and contracts where the profit adjustment is made by the unilateral determination of an officer in the government as in the case of award fee contracts.

52.  A **times-and materials (T&M)** contract provides for acquiring supplies or services on the basis of --

(a).  direct labor hours at specified fixed hourly rates that include wages, overhead, general and administrative expenses and profits, and

(b).  actual cost of materials (except in limited circumstances).

A T&M contract provides no positive profit incentive to the contractor for cost control or labor efficiency and may be used only when it is not possible at the time of placing the contract to estimate

accurately the extent or duration of the work or to anticipate costs with any reasonable degree of confidence. T&M contracts generally include a ceiling price that the contractor exceeds at its own risk, but the ceiling price may be increased by amendment. The definition for purposes of T&M contracts of the term "hourly rate" means the rate(s) prescribed in the contract for payment of labor which meets the qualifications of a labor category specified in the contract. The term "materials" is broadly defined to include "direct" materials that enter into the end product or are used or consumed in connection with furnishing the end product or service; subcontracts for supplies and incidental services for which there is not a labor category specified in the contract; other direct costs (e.g., incidental services for which there is not a labor category specified in the contract, travel, computer usage charges, etc.) and applicable indirect costs.

53. **Federal Acquisition Regulations (FARs)** state that a firm-fixed price contract best utilizes the basic profit motive of business enterprise and shall be used when the risk involved is minimal or can be predicted with an acceptable degree of certainty. The FARs further state that use of cost-reimbursement or time-and-materials contracts should be avoided after experience provides a basis for firmer pricing.

**H.     Air Force program contract types relating to the work performed at BSS-SA**

54. A combination of contract types cover the Air Force program work performed at BSS-SA. With respect to each program, different contract types may, and frequently do, apply among the different subdivisions of work covered under particular CLINs, sub-CLINs, etc. Different contract types may even apply within a single subdivision. For instance, under the C-17 program, CLIN 9, "Over & Above," provides that Over-and-Above work will be awarded on a firm-fixed price basis for the Repair of Reparables [sic] and on a T&M basis for all other work.

55. RED X work is paid on the basis of T&M, whereas most of the planned work is paid on the basis of other contract types, including on a firm-fixed price and incentive contract basis.

## VI.

### The Defendant's fraudulent conduct

56. Since 2000 and earlier, Boeing has knowingly and systematically engaged in a fraudulent scheme to increase its profits and incentive fees and awards by illicitly shifting costs and charges among tasks and misrepresenting that work was performed on one task when, in fact, the work was performed on another task payable under a different contract type.  By way of illustration, costs and charges have been misrepresented to have been incurred for RED X work payable on the basis of T&M, when in fact the costs and charges were incurred for planned work payable, e.g., on a firm-fixed price or incentive contract basis.  In this way, Boeing has been able to avoid, and has been able to shift to the government, the risk of performance costs on planned work, protect its profit and/or meet or exceed cost targets on which incentive fees and awards are based, and at the same time receive full payment of all of its costs and charges without risk.

57. The defendants' general cost-charge shifting scheme is carried out in a variety of fact patterns, and specific information and representative examples in support of relators' allegations of cost-charge shifting fraud are described and discussed in the following paragraphs of this section of the complaint.

**A. Charging labor to RED X over-and-above task(s), when actual work performed on unrelated, planned task(s)**

58. Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States by directing and causing company and subcontractor employees to fraudulently scan and charge time to RED X over-and-above tasks when, in fact, they were performing planned tasks.

59. By way of example, the practice of mischarging time to O&A in order to avoid exceeding approved and accountable time was so widespread at BSS-SA, and so well known to management, that on 17 August 2000, at 3:11 p.m., Senior Manager Sean Downey sent an e-mail to Armando Goylia, Chris Bellamy, Douglas Stohlman, John Alcala, Joseph Sharkey, Matthew Shope, Robert Zoricic,

15

Scott Smith, Vaaalutasi Lelea, William Timoteo, Matthew Drummond, and Thomas Jarocki, the 12

first-line aircraft managers under his supervision, subject: STUFF! advising that

> ". . . Clinton [Craddock] will be E-mailing the O&A list whenever there is a change, this is
> your tool to MANAGE O&A hours to the estimates as well as proper labor charging. And just
> for the record, O&A is not a crutch to make up the difference so you don't blow your budget
> on GRIP [planned Depot work]. We ALL know this is what's happening and someday
> somewhere *somebody* will have to answer to an auditor for it! . . ."

(emphasis in original). This e-mail reflects Boeing managements' recognition of the prevalent

practice of cost/charge shifting between RED X and planned work.

60. By way of further example, in an E-mail sent by C17 Program Director Mark Wigant on 17

December 2004, at 9:23 a.m., to aircraft managers and other Boeing management, Wigant advised that

because he had "long suspected that we have been negligent in our labor accounting responsibilities,"

he had tasked Staff Analyst and Office Administrator Helen Hampton with auditing employees'

"Autotime" (electronic timekeeping) entries weekly. Wigant's E-mail listed "Autotime anomalies from

last week," and warned that "[m]any of these infractions could not be justified during a DCAA audit,

which means they could be deemed ILLEGAL." (emphasis in original) Hampton responded to Wigant

less than an hour later, saying she had been dealing with "a lot of tension over this. Especially since

we have been under the microscope for the last several months and I know that if we are put through

a serious audit we will fail miserably, from prior records, even. I have discussed this over and over,

but they have not taken it seriously."

61. As another example, in February 2006, contractor HJ Ford sent Kathy Church to BSS-SA to

reconcile Boeing's fiscal year 2005 Red X billings for work done on four British military aircraft

["Reconcile FY05 GRIP UK A/C (Depot / Red X labor and material)"] **("A/C" is a short form**

**reference for "Aircraft")**, and to "Reconcile USAF Master TCTO O&A finding spreadsheets with

BLSS [BSS-SA] (O&A funding vs. CCNs vs. Bar Coding issues) to ensure correct charges are being

16

incurred between Boeing and USAF." Church's draft "Trip Report" dated 6-17 February 2006 details

charging discrepancies noted and unanswered questions raised in her attempt to reconcile the accounts

examined. In Finding No. 8, Church recited, "On the USAF side, I've been informed that all TCTOs

added by an amendment are being charged to the Depot O&A funding. This in turn would cause this

account to overrun the funding previously approved." In Finding No. 9, Church stated, "I'm

confused....I've been told that the A/C Manager is already covered under the hourly labor rate, but then

I'm being told he uses the bar code issued for red x to the a/c and clocks in under that a/c." Her

"Observations" included these:

> "1. I saw a definite lack of communications between contracts and pricing, O&A Red X coordinators and upper management at BLSS [BSS-SA]. They are being left out in the cold without the proper tools to do there work.

> "2. We definitely need an in-depth look at the material lists charged against each USAF aircraft. Need Alice reports ran against each FY05 and FY06 A/C to ensure we aren't charged incorrectly!"

62. As a further example, relator Clinton Craddock complained to BSS-SA management in 2006

that the time of Boeing engineers in Long Beach, California, was being charged inappropriately to Red

X O&As on C17 aircraft repairs at BSS-SA. Craddock had pointed out to BSS-SA management that

engineers are not "touch labor," and that even the time of Boeing engineers at BSS-SA can not

appropriately be charged to Red X O&As. On 31 October 2006, at 4:58 p.m., BSS-SA Business

Operations Manager Don A. Lichtenegger sent a lengthy and detailed E-mail to Stephen L. Kennedy,

a Boeing Senior Manager in Long Beach, seeking resolution of the issue raised by Craddock.

Lichtenegger told Kennedy,

> "The C17 program at BLSS in San Antonio [BSS-SA] has a local employee who has taken issue with CCN's that are being used and charged in Long Beach. He has stated that he is submitting the issue to Ethics as labor mischarging. He has also discussed the issue with at least one government person at SG in Dayton, Ohio. The employee in question has a history of submitting mischarging allegations, and this is another that we need to resolve quickly."

63.  Lichtenegger explained in his written discussion of the complaint raised by Craddock that "[t]he Long Beach departments charge to the CCN on the form when performing their stress and durability analysis" pursuant to "liaison engineering disposition" submissions from BSS-SA pertaining to aircraft under repair at that facility, and he reported that "[t]he charges by the Long Beach departments to aircraft over and above CCN's are alleged to be mischarges by the BSS employee."

64.  On 2 November 2006, at 7:38 a.m., Sandra Ruelle, Boeing C17 Cost Account Manager for O&A at Long Beach, E-mailed Boeing Operations Support Senior Manager Satenig Ghazarian (Long Beach), concerning Lichtenegger's inquiry and suggested the engineering charges in question should be charged to one of Ghazarian's cost accounts.

"Apparently this has been charged to the specific O&A task over the last several contracts.  I can appreciate why the support continues to be requested from LB, however we have not specifically called out the support in our estimates.  In talking with Kathy Church [government representative] this morning, she was aware of this (Trey had inquired) and Marty had indicated that starting October 06 this type of task should be charged to the GSP contract. It was believed it was to your cost account.  That being the case, we would be journaling October 06 on back-to you."

65.  Ghazarian protested to accepting responsibility for the cost.  At 11:23 a.m. on the same day, he responded by E-mail to Ruelle,

"What cost account do I have that they would charge to?  When I generate a labor estimate for Over & Above to perform a modification, there are touch labor hours and we estimate 50% support hours.  I would expect those support hours to include any effort related to the [sic] accomplish the task.  So, I am not aware of any journaling that would need to occur.

**B.  Charging labor to aircraft tasks, when actual time spent on off-aircraft activities**

66.  Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States by directing and causing company and subcontractor employees to fraudulently scan and charge time to aircraft tasks, when in fact, they have been engaged in off-aircraft activities, including, by way of example, EI meetings, medical visits, human resource visits, etc. (See ¶¶ 42-48).

67.  On 17 May 2004, Mike Salerno, Director of Finance at BSS-SA, issued a memorandum to all

personnel directing that effective that date,

"all hourly touch labor employees should charge time spent on Employee Involvement (EI) meetings/activities directly to the work authorization card being worked on at the time of their EI meetings. Time spent on EI by hourly touch labor employees should no longer be charged to program bulk labor barcodes."

68. According to the memorandum, this was a management decision.

"The BASC leadership team recently approved this change because we believe EI activities directly benefit the processes we use to produce our end products and the cost associated with EI should therefore be charged directly to the end products as well."

69. In a followup E-mail on the same date, Senior Aircraft Manager Mark Wigant admonished some 40 addressees to "[p]lease ensure that we comply with this memorandum. I realize that it may initially affect our CPI [Cost Performance Index], but it should motivate us to develop process improvement initiatives that will eventually save us time and money."

70. Notwithstanding his instruction to charge EI time to the government, Wigant insisted that it was not to be an included by Craddock in O&A time estimates. Upon receiving Wigant's E-mail, Relator Craddock inquired by E-mail on that date whether the O&A estimators "should start including E.I. meeting time in the estimates?" Wigant's E-mailed response, sent 12 minutes later, was **"Absolutely not! Process improvements should reduce time, not add to it."** (Emphasis in original).

71. Mike Salerno issued another memorandum on the subject of EI Labor Recording Practices to all BSS-SA personnel, dated February 17, 2006, AB-2006-07. The memorandum states, in part, that "All hourly touch labor employees should charge time spent on Employee Involvement (EI) meetings and activities directly to the work authorization card being worked on a the time of their EI meetings."

72. As reflected in an E-mail chain beginning with Relator Fred Van Shoubrouek's inquiry of 20 February 2006, at 12:14 p.m., addressed to Susanna Murray, George Gilman and Bernard Hartman, Van Shoubrouek reiterated his doubts about the propriety of charging EI time to work authorization

cards, as ordered by Salerno's 17 May 2004 and 17 February 2006 memoranda.

73.  In a series of succeeding E-mails, the question was reviewed and commented on by Boeing officials in Long Beach, California (Murray, Gilman), whose ultimate decision, in an E-mail sent 27 May 2006, at 3:38 p.m., by Susanna Murray, was to ask "the director that issued the directive" (*i.e.,* Mike Salerno, at BSS).

74.  In mid-June, 2007, Boeing issued a statement reversing its prior orders directing employees to charge EI to the work authorization card being worked on a the time of their EI meetings, at an all hands meeting of KC-10 program employees.

75.  In addition to hourly employee EI time being charged to aircraft O&A accounts, time has also been charged for other off-aircraft activities such as FOD walks, crew meetings, company activities, and visits to the Human Resources office and the medical clinic.  The proper procedure would have been for the employee to scan to the bar code for the particular off-aircraft activity, instead of remaining scanned to the work authorization card being worked immediately prior to the off-aircraft activity.

76.  By way of example, on 21 September 2005, hourly employees R.C. and J.S.,[4] both employed by Boeing in the C17 program, visited the Human Resources office.  Their employee time records for that date reflect that each spent a full day on the job, and that their time was charged to aircraft tasks.  With the exception of 0.5 hours for lunch, no time for either employee was charged to an off-aircraft activity, which signifies that the time spent by each employee at the Human Relations office was included in the hourly charges accrued to the USAF jobs on which they were clocked in.

Similarly, on 1 September 2005, hourly employees S.R., R.H., J.C., M.R., G.S. and M.C.,[5] all employed by Boeing in the C17 program, visited the BASC Medical Clinic. Their employee time

---

[4]For reasons of privacy, these employees are identified in this complaint by initials only.

[5]For reasons of privacy, these employees are identified in this complaint by initials only.

records for that date reflect that each spent a full day on the job, and that their time was charged to aircraft tasks. With the exception of 0.5 hours for lunch, no time for any of those employees was charged to an off-aircraft activity, which signifies that the time spent by each employee at the Medical Clinic was included in the hourly charges accrued to the USAF jobs on which they were clocked in.

77. Boeing also abused the 29 minute rule (See ¶ 48) by manipulating time to avoid charging to boss talk overhead and similar activities. This practice subsided after Craddock reported the issue to his supervisors.

**C. Charging labor to cannibalize parts from one aircraft for another aircraft, when the parts should have been available from the special inventory of limited parts maintained by Boeing and pre-paid by the government (MICAP CANNS)**

78. Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States with regard to parts inventory pre-paid by the government and managed by Boeing to support aircraft in the field. In instances where Boeing has not had or does not have a needed part in inventory, Boeing has appropriately cannibalized the part from another aircraft at BSS-SA. However, Boeing then improperly has directed and caused company and subcontractor mechanics to scan and charge time to an unrelated task, instead of to the special no labor charge bar code assigned for the removal of the part. Labor charges for the removal from other planes of parts which should be maintained in the pre-paid parts inventory (**"MICAP CANNS"**) are not chargeable to or payable by the government.

79. Boeing's knowledge that labor hours incurred on cannibalization of parts to accomplish a MICAP CANN must be charged to a CCN for which Boeing, and not the government, is responsible is reflected by the email dated 12 May 2004, at 12:55 p.m., from Art Martinelli to Mark Wigant and other addressees, subject: EXPEDITE CANN authorization from BASC A/C to Satisfy Fielded Aircraft MICAP at Jackson ANG, MS." In this e-mail, Martinelli advised Wigant that,

> "THE COST CHARGE NUMBER FOR THE CANNIBALIZATION LABOR HOURS ASSOCIATED WITH THIS PART (BOEING MANAGED ASSET) SHALL BE PROVIDED BY BOEING."

80. By way of further documentation of the improper practice, in an email communication sent by relator Craddock 19 November 2004 at 9:49 a.m. to Rodger Beckham, Edgar Anderson, Grover Boyett, Nancy Valin, and Don Lichtenegger, subject: "MISCHARGING OF MICAP CANNS," Craddock advised the addressees that in "doing an audit of all 04 MICAP CANNS," he had discovered numerous discrepancies reflective of time being charged inappropriately for MICAP CANNS. The email identifies, by number, date and description, the specific job and the date labor hours attributed to the task were loaded into Boeing's Autotime program. In many instances (for example, on #s DJ043L01, DJ043L02, DJ043L03, DJ043L05, DJ043L06, DJ043L07 and others), no time was charged to the MICAP CANNS for which there is a discrete Boeing CCN, which indicates the time loaded into Autotime was improperly charged to a CCN for which the United States pays. In the e-mail, Craddock pointed out that every MICAP CANN request from the Air Force includes the previously quoted admonition that,

"THE COST CHARGE NUMBER FOR THE CANNIBALIZATION LABOR HOURS ASSOCIATED WITH THIS PART (BOEING MANAGED ASSET) SHALL BE PROVIDED BY BOEING."

81. As proof that this practice has continued despite Boeing's knowledge of its impropriety, NCR316197N (**"NCR" stands for "Non Conformance Record"**), created 21 August 2007, reflects a request for a "1A" MICAP for aircraft P-100 (02-1100) for a part not available in stock and states that "a request to CANN an ACM with the [appropriate part number] has been submitted to satisfy the req." and that "a part is expected to be returned to San Antonio by the end of September to pay back the canned part." The NCR estimate reflects that no time was to be charged to the task. The clocking detail sheet for that same NCR, however, reflects a total of 3.4 hours spent on the task by employees G.C. and J.I.[6] The applicable Autotime sheet reflects that the time spent by those employees on the task was actually improperly charged to the Air Force.

---

[6]For reasons of privacy, these employees are identified in this complaint by initials only.

**D. Charging labor to unrelated task(s), instead of to the discrete bar code created to account for charges to cannibalize parts from one aircraft for another aircraft, in situations where the parts are not parts maintained by Boeing in the special inventory of limited parts pre-paid by the government (AF CANNS)**

82.  Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States with regard to parts which are <u>not</u> maintained as part of pre-paid inventory needed to support aircraft in the field.  In instances where Boeing has needed a part for an aircraft in order to meet the plane's particular delivery schedule, Boeing appropriately has cannibalized the part from another aircraft at BSS-SA.  However, even though the Air Force will pay the labor charges for the removal and installation of the part, Boeing improperly has directed and caused mechanics to scan and charge time to an unrelated task, instead of to the special bar code created and assigned for the task.

83.  An example of Boeing's practice of charging to the wrong government aircraft labor incurred in cannibalizing parts from one aircraft to another, thus distorting the repair and cost histories of both aircraft, is reflected in NCR314847N, created 10 August 2007 at 21:12 hours. This NCR shows that the task was a CANN, attributable to a planned Over & Above and thus subject to a budget, but was charged to a RED X account ("Seq. #/ASA #: P76A0288").

**E. Charging labor to unrelated task(s), instead of to the discrete bar code assigned to account for charges associated with the repair, replacement, and other costs of lost, damaged, and destroyed government property (LDDs)**

84.  Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States with regard to the account funded under the contract(s) to cover the repair, replacement or other cost of government property **lost, damaged, and destroyed (LDDs)** during the performance of work on an aircraft, so that the work on aircraft may proceed without delay.  In particular, Boeing has directed and caused company and subcontractor employees to scan and charge time for the remedial work to unrelated tasks, instead of to the bar code assigned to the task.

85.  By way of example, when a request for approval was initiated by E-mail 25 April 2007 from

Nancy Valin to Kathryn Church at HJ Ford, for P-16 (93-0600) LDD WITHHOLD WORK 426 617, a series of E-mails followed.  On 7 May 2007, at 11:47 a.m., Relator Craddock reminded all addressees, "This was never resolved.  P16 has already returned to its MOB [Main Operating Base].  What is the status on a resolution to this issue?"  On the following day, at 9:04 a.m., Craddock advised all concerned, "I've just audited this LDD and found the following: 28.0 were charged to correct the damage which equates to $2,996.00 and the effort was charged to the aircraft's REDX CCN 'DJ079A2W.'"

86.  Helen Bryan, DCMA Administrative Contracting Officer in Long Beach and a recipient of Craddock's E-mail, responded by E-mail at 11:21 a.m. on the same day.

"Thank you Clinton. I am dismayed that this was charged direct to the REDX CCN.  I had specifically stated in past emails that this process of charging direct to tasks had to stop immediately. I thought this had been done. Are you saying that LDDs are still being charged direct to the task where the LDD occurred? Boeing has not even been given relief for these charges. It has to be put in a holding CCN until authorization is given by the ACO [Administrative Contracting Officer] and the $ set aside. The $ are not included in the task you charged them to."

87.  By way of further example, an inquiry by E-mail 8 August 2007, from Boeing's Rezvan Memaran, Business and Planning Analyst, IDS Support Systems (Long Beach), to Boeing's Pamela McNeill, Government Property Specialist (Long Beach) regarding "the status of actual completion for 9DQ -LDDs" was referred to Relator Craddock, who received an E-mail sent by Memaran at 5:47 p.m. on that same date. In subsequent E-mails on which Boeing's Sandra Ruelle (Long Beach) was copied, Craddock explained the significance of certain entries on the pertinent records.  "When there is zero hours (actuals), that means the mechanic clocked to something else, the NCR was not clocked properly. . . The file I put together is only displaying what the actual data is for tracking purposes. I have no influence over proper charging, when the repair will be worked and completed, over-runs, etc."

88.  On 10 August 2007, at 3:58 p.m., Ruelle queried Boeing's BSS-SA Business Operations

Manager Edward Soto, "Per the following we are having NCR'S not clocked properly. That is labor. I hear from my material folks that they have received no charges for materials for any of the LDDs. What is the planned oversight or corrective action for these (apparently) systemic issues?"

**F.  Charging labor to duplicate over-and-above tasks relating to the same work**

89.  Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States by submitting and receiving approval and funding for duplicate over-and-above tasks relating to the same work and directing and causing company and subcontractor employees to scan and charge time to each over-and-above bar code for the full amount of approved time, including time for work performed on unrelated tasks.

90.  By way of example, NCR 304674N, created 14 May 2007, was cancelled 23 May 2007 as a duplicate of NCR 304684N.  The Estimate Print page of that NCR recites "DUPLICATE SEE NCR 304684N, ESTIMATING AN [sic] SUPPLY TO CANCELL [sic] ALL HOURS AND PARTS REQUESTED, CANCELLING NCR."  Notwithstanding the cancellation of this duplicate NCR, however, the clocking detail for NCR 304674N shows that a total of 14.9 hours of labor was charged to this NCR on 16, 17 and 18, 21 and 23 May 2007 by Boeing employees S.V., J.P., F. M., and two others listed only as M496486 and M497477, and that the job was sold and closed 24 May 2007 at 8:47:49 a.m.[7] In a related email communication to relator Craddock dated 23 May 2007 at 11:54 p.m., subject: NCRs 304684, 304674, Nancy Valin requested that Craddock "Please check this out. I rejected 304674 back to Lubeck. This NCR states sold complete and installed bracket, NCR 304684 also states it was installed. They want to cancel 304674, however I believe this should be looked into. How can they _**both**_ be sold complete?"

**G.  Charging labor to cancelled tasks, when actual work performed on unrelated aircraft/task**

91.  Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States

---

[7]For privacy reasons, only initials of the employees cited are used in this complaint.

with regard to cancelled over-and-above tasks.  In instances where an approved and funded over-and-above task has been cancelled, Boeing has directed and caused company and subcontractor personnel to continue scanning and charging time to the cancelled task.  Boeing's accounting system does not disable the ability to charge time to cancelled tasks.

92.  By way of example, NCR306330N, created 31 May 2007, was closed on 3 July 2007 because the parts required for the task did not arrive in time for the repair to be accomplished before the aircraft departed BSS-SA.  At page 2 of the NCR, the "buyoff comments" column reflects "REQUEST FOR CARRY FOREWARD HOME STATION HAS BEEN APPROVED. PARTS NOT ABLE TO ARRIVE IN TIME TO SUPPORT AIRCRAFT DELIVERY."  Nevertheless, the clocking detail pertaining to that NCR reflects that a total of 22.8 hours of labor were charged to that NCR on 16 and 21 July 2007 by Boeing employees S.L., S.V., E.Z. and P.M., and the job was sold on 21 July 2007 at 1:24:16 p.m. and closed on 23 July 2007 at 11:14:47 a.m.[8]

**H.  Multiple charges for the same part needed and used to complete and close out an over-and-above task, when only one part needed and part was requisitioned from multiple, different sources for the sole purpose of expediting receipt of the part**

93.  Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States with regard to instances where a part which was not maintained in pre-paid inventory to support aircraft in the field was needed to complete and close out an over-and-above task.  In such instances, it has been a common practice of Boeing managers to requisition the part from multiple sources, e.g., by contemporaneously ordering a part, requesting the fabrication of the part, and requesting authority to cannibalize a part from another aircraft, and use the first part received.  Boeing then improperly charged and was paid by the Air Force for the parts received from all sources, resulting in double or triple billing for the same part.

94.  By way of example, NCR 294055N, created on 2/12/07, requested fabrication of a bracket for

---

[8]For privacy reasons, only initials of the employees cited are used in this complaint.

aircraft P34. The NCR reflects that an order was also placed for the same part.

**I.    Obtaining approval and funding of over-and-above tasks to repair or replace defective parts or obtain missing parts, and in some instances to install repaired or replacement parts, when kits received from suppliers for planned work contained defective parts or were incomplete**

95.  Since 2000 and earlier, Boeing has knowingly and systematically defrauded the United States with regard to parts included in kits received from suppliers to perform planned work, which parts have been visually defective or missing upon receipt or later discovered to be defective after installation and testing.  Boeing inappropriately has processed over-and-above tasks to repair a defective part or to process an order to replace a defective part or obtain a missing part, and in some instances, also to install a repaired or replacement part.  Where the part was missing or visually defective upon receipt, this practice results in the government paying for the same part twice.  Where the part is discovered to be defective after installation, this practice results in the government paying for the same part twice and for the labor to remove and replace the defective part.  Under both circumstances there should be no charge to the government.

96.  NCR 320488W, created 9/25/07, is an example of a request to repair a kit part for which repair the government was improperly charged.

**J.    Other information and representative examples of cost-charge irregularities**

97.  Boeing has knowingly and systematically defrauded the United States by charging labor to completed tasks, when actual work performed on unrelated tasks.  By way of example, an undated, hand-written memo by Boeing employee M. T. reflects that in discussing with Boeing employee R.W., TCTOs 1624, 1622, 1447, and 1441, all of which M. T. sold to DCMA on several aircraft, M. T. learned for the first time that all of those TCTOs were previously funded under FLT-005, and that Boeing nevertheless had still clocked time to those TCTOs.[9]  Also, in instances where the total number of approved hours for planned work have not been fully expended in completing a particular task,

---

[9]For privacy reasons, only initials of the employees cited are used in this complaint.

Boeing has directed and caused company and subcontractor employees to continue scanning and charging time to the completed task, when in fact, they have been performing work on an unrelated activity.

98.   Boeing has knowingly and systematically defrauded the United States by charging labor to tasks on delivered aircraft returned to operation, when actual work performed on unrelated task on another aircraft.  In instances where tasks on an aircraft have been performed and the aircraft has been returned to service, Boeing has directed and caused company and subcontractor personnel to continue scanning and charging time to the tasks performed on the delivered aircraft.  Although Boeing's accounting system initially has placed these time charges in a "suspense " account, the charges on a routine, weekly basis have been cleared from the "suspense" account and transferred into one or more other accounts which have been billed and paid by the government.

99.  Boeing has knowingly and systematically defrauded the United States by charging labor for planned, unfunded tasks to existing approved, funded tasks.  With regard to certain planned work which has not been funded, Boeing has directed and caused company and subcontractor personnel to begin the proposed task and scan and charge time to existing approved and funded tasks.

100.  Boeing has knowingly and systematically defrauded the United States by charging labor for unapproved, unfunded over-and-above tasks to existing approved, funded tasks. With regard to instances where a submitted over-and-above task estimate has not been approved, funded, and assigned a unique bar code, Boeing has directed and caused company and subcontractor personnel to begin the proposed task and scan and charge time to existing approved and funded tasks. Relator Craddock has raised the impropriety of this practice on previous occasions.  By way of example, Craddock sent an e-mail dated October 7, 2003, to Mark E. Wigant, C-17 program director, Sean P. Downey, senior manager, Don Lichtenegger, business operations manager,  and others, stating that he was seeing an increase in **RIDDS (Removal / Installation Discrepancy Documents)** being worked before receipt

of approval of the work from the government's representative. At that time, a RIDDS was the document used to record discovered, unplanned work, submitted for approval and served the same purpose that NCRs have served since sometime in 2004.

101. Boeing has knowingly and systematically defrauded the United States by charging an improper CCN for the repair of parts which should have been charged against an aircraft's RED X over-and-above funding. An undated memorandum to Charlie Burns, C-17 QA Manager, from Paul Schleicher, C-17 MRCC, list parts which were repaired by the local MRCC and returned to stock and were charged to an improper CCN, instead of the appropriate aircraft RED X over-and-above funding.

102. Boeing has knowingly and systematically defrauded the United States by charging the government twice for a single task. By way of example, the e-mail communication dated 16 April 2007 at 11:51 a.m., from Larry Stepney to Annette Griebsch and others, subject: TCTO 1182 (pertaining to NCR 300505), reflects that TCTO 1182, involving a particular task ("Gear Mod") was "signed off in GO 81 as of March 02." The e-mail continues, "We were doing the Gear Mod and discovered that this TCTO was not complied with. It was signed off at Charleston and is a DEPOT LEVEL TCTO. I need someone to show that this TCTO wasn't complied with in GO-81. Take it out of 01 status. We will comply with the TCTO at the BSS. This will be added to the 103." The work was subsequently done at BSS-SA, and the government was charged for it, notwithstanding that Boeing had previously charged the government for the same work (without doing the work) at Charleston. Thus Boeing charged the government twice for the same job; first, when the work was not done at Charleston, and later, when the work was done at BSS.

103. Boeing has knowingly and systematically defrauded the United States by improperly pressing estimators to revise RED X estimates to increase the number of hours of labor to be submitted for approval by the government. On occasion, estimators have been pressed to add hours to their estimates even after the tasks in question have been completed and the NCR closed. By way of

example, Jennifer J. White sent an e-mail dated August 23, 2007 to C-17 estimators Edgar L.

Anderson, Craddock, and Nancy J. Valin and C-17 Business Operational Manager Edward Soto

requesting 13 additional hours beyond the 50 hours originally estimated for NCR 308083N and 13

additional hours beyond the hours originally estimated for another NCR.  Craddock investigated the

request and discovered that NCR 308083N had been completed and closed on August 13, 2007.

**VII.**

**The United States has been damaged**

104.  Since at least as early as 2000, Boeing has profited and the United States has been damaged

monetarily by the practices used by Boeing to make false claims to the United States Air Force

programs for payment and reimbursement.  Boeing has submitted many false claims for excessive and

unauthorized payments and reimbursements and has obtained excessive compensation from the United

States as a result.

**VIII.**

**Plaintiffs' direct and independent knowledge of Defendants' fraudulent conduct and voluntary disclosure of the information to the government before filing this action**

105.   To the relators' knowledge, there has been no "public disclosure" of allegations or

transactions of fraud by defendants regarding the subject of the relators' claims; but if it is proved that

any such public disclosure did occur before the filing of this action, the relators will show that they

are "original sources" within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

106.  Craddock gained direct and independent knowledge of the defendants' fraudulent practices

while employed by Boeing at BSS-SA from September 28, 1998 to the present (See ¶ 5).

107.  Van Shoubrouek gained direct and independent knowledge of the defendants' fraudulent

practices while employed by Boeing at BSS-SA from November, 1998 to the present (See ¶ 6).

108.  Relator Rico gained direct and independent knowledge of the defendants' fraudulent practices

while he was employed as an aircraft mechanic by Boeing subcontractors Piping and Design Systems

30

and Aerotek (See ¶ 7).

109.  Relator De La Garza gained direct and independent knowledge of the defendants' fraudulent practices while employed by Boeing at BLSS from 2001 to July 2007 (See ¶ 8).

110.  Before filing this action, relators personally and through counsel voluntarily provided substantially all material evidence and information in their possession to the United States in telephone conversations, meetings and interviews with federal prosecutors and investigators, commencing in approximately April, 2007.

## IX.

### Count One
### Federal False Claims Act 31 U.S.C. § 3729(a)(1)

111.  Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 110 of this complaint.

112.  This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

113.  By means of the acts described above, Boeing has knowingly presented or caused to be presented false or fraudulent claims for payment to the United States. The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid Boeing for claims that would otherwise not have been allowed.

114.  By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## X.

### Count Two
### Federal False Claims Act 31 U.S.C. § 3729(a)(2)

115.  Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 2 of this complaint.

116. This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

117. By means of the acts described above, Boeing has knowingly made, used, or caused to be made or used, false records and statements to get false or fraudulent claims paid by the United States. The United States, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid Boeing for claims that would otherwise not have been allowed.

118. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## XI.

### Jury Demand

119. Plaintiff demands a trial by jury.

## XII.

### Conclusion

120. The defendants are liable to the United States Government for civil penalties and treble damages, pursuant to 31 U.S.C. § 3729(a). In addition, the plaintiffs are entitled to recover their reasonable expenses, attorney's fees, and costs incurred in prosecuting this action, pursuant to 31 U.S.C. § 3730(d). Further, the plaintiffs are entitled to a share of the recovery obtained by the United States as a result of this action, pursuant to 31 U.S.C. § 3730 (d).

WHEREFORE, Plaintiffs pray that upon trial or final hearing the Court grant judgment for Plaintiffs and the United States against the Defendants, as follows:

    a.  for civil penalties for each false claim, pursuant to 31 U.S.C. § 3729(a);

    b.  for three times the amount of damages proved, pursuant to 31 U.S.C. § 3729(a);

    c.  for Plaintiffs' reasonable attorneys' fees and expenses;

    d.  for costs of court;

e.  for pre-judgment and post-judgment interest at the rates permitted by law; and

f.  for such other and further relief as may be appropriate and authorized by law.

Plaintiffs further pray that they be awarded an appropriate percentage of the amount recovered by and for the United States as a result of this action, in accordance with 31 U.S.C. § 3730(d).

Respectfully submitted,

By: _____

Glenn Grossenbacher
TX Bar No. 08541100
1800 McCullough
San Antonio, Texas  78212
Tel:  (210) 271-3888
Fax:  (210) 271-3980

GOODE CASSEB JONES RIKLIN CHOATE &
WATSON
A PROFESSIONAL CORPORATION
John E. Clark
State Bar No. 04287000
Rand J. Riklin
State Bar No. 16924275
2122 North Main Ave.
San Antonio, Texas 78212
Tel:  (210) 733-6030
Fax:  (210) 733-0330

Gary M. Grossenbacher
TX Bar No. 24008972
8114 Talbot
Austin, Texas 78746
Tel: (512) 327-4531
Fax: (512) 306-0137

ALVARADO & ALVARADO, P.L.L.C.
Leo Alvarado, Jr.
TX Bar No. 01126500
Rosemarie Alvarado
TX Bar No. 24036131
115 Camaron, Suite 100
San Antonio, Texas 78205

33

Tel: (210) 223-2685
Fax: (210) 223-9464

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing complaint has been served pursuant to FED. R. CIV. P. 5(b) and 31 U.S.C. § 3730(b)(2) on *29 October 2007* in the manner indicated to the following persons:  by Certified Mail, Return Receipt Requested upon the Honorable Peter D. Keisler, United States Attorney General, 950 Pennsylvania Ave., NW, Washington, D.C. 20530, and by hand delivery upon the Honorable Johnny Sutton, United States Attorney for the Western District of Texas, 601 N.W. Loop 410, San Antonio, Texas.

Glenn Grossenbacher